**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| DENNIS HART, | |
|---|---|
| Plaintiff, | No.  C22-2024-LTS |
| vs. | |
| DEERE & COMPANY d/b/a JOHN DEERE WATERLOO WORKS, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

## I.     INTRODUCTION

This matter is before me on a motion (Doc. 18) for summary judgment filed by defendant Deere & Company d/b/a John Deere Waterloo Works (Deere).  Plaintiff Dennis Hart has filed a resistance (Doc. 23) and Deere has filed a reply (Doc. 29).  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.     PROCEDURAL HISTORY

Hart filed this action in Iowa District Court for Black Hawk County on November 8, 2021.  *See* Doc. 3.  On May 25, 2022, Deere removed the case to this court based on diversity jurisdiction under 28 U.S.C. § 1332 and supplemental jurisdiction under 28 U.S.C. § 1441.  Doc. 1.  Hart asserts claims under the Iowa Civil Rights Act (ICRA) based on racial discrimination, hostile work environment and retaliation.[1]  Deere has filed an answer (Doc. 4) denying the claims and asserting various affirmative defenses.

---

[1] Hart previously filed an administrative complaint with the Iowa Civil Rights Commission and obtained a right-to-sue letter.  *See* Docs. 3, 4, 1-10 at ¶¶ 7-8.

Deere timely filed its motion for summary judgment. Trial is scheduled to begin December 11, 2023.

### III. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of

2

a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV. RELEVANT FACTS

The following facts are undisputed unless otherwise noted. Hart is employed at Deere's Waterloo, Iowa facility as a CNC Machine Operator. At all relevant times, Hart's employment has been governed by a collective bargaining agreement (CBA) between his union and Deere. Under the CBA, Deere could discipline employees for "good and just cause" within the limitations set forth in the CBA. The most severe form of discipline that an employee's supervisor could issue was a Positive Action Fact Sheet (PAFS), or a written warning. The PAFS must be removed from an employee's record

one year from the date it is issued.  Supervisors do not have authority to issue more severe forms of discipline, including suspension or termination of employment.

In the event more severe discipline is necessary, the CBA requires Deere to hold a disciplinary action hearing (DAH) to investigate and consider further discipline beyond a PAFS.  The employee is entitled to attend this hearing with a union representative.  After the hearing, Deere's Labor Relations Department determines whether to issue discipline and the severity of any discipline.  Any discipline imposed after a hearing must be removed from the employee's record after three years.  If discipline results in a suspension for less than 30 days, the CBA requires the suspension be served on paper only.

On November 19, 2018, Hart started working in Department 509/510 under the supervision of Rodney Nieman.  On October 11, 2019, Nieman issued Hart a PAFS for producing scrap.  Hart states that Nieman micromanaged him, over-monitored him, interfered with his breaks and excluded him from social groups.  Deere argues the record citation does not support this assertion but admits that Hart felt that Nieman was "nitpicking" him and giving him instructions.  Hart states that on October 20, 2020, he complained to Katie Harn, in Labor Relations, about Nieman's conduct.  Deere disputes that the record supports this assertion and, even if it does, argues this report did not amount to "protected activity" under the ICRA.

The parties agree that as a supervisor, Nieman had authority to ask employees who reported to him to perform work duties on a day-to-day basis.  Since August 2017, Nieman has issued PAFS forms to 16 different employees, only two of whom (including Hart) were Black.  Five employees received discipline more than once.  Hart disputes this, stating that Nieman issued 11 PAFSs during the relevant time period and that only one was issued for scrap, which was issued to Hart.  Hart also asserts that of these 11 PAFSs, none were issued to the same employee.  Hart received only one PAFS from Nieman.

On November 10, 2020, Deere held a DAH for Hart based on a charge that Hart had failed to perform required checks in the manufacturing process, resulting in scrap. Hart admits that he failed to perform the required checks that led to this hearing. Deere issued Hart a three-day "Suspension on Paper" as a result of the November 10, 2020, hearing, which would remain in Hart's work record for three years. The parties dispute the repercussions of the suspension on paper. Deere states it is merely documentation of the issuance of written discipline and does not result in a change of pay or any time away from work. Hart maintains that it substantially affects an employee's rights and opportunities pursuant to the CBA. Nieman had no authority to determine whether Deere should issue discipline following the hearing. In any event, after the hearing Nieman relocated Hart to a different work area and assigned him a new type of work that Hart had never performed. This required additional training, which Nieman provided and continued to supervise Hart during this period.

On January 27, 2021, Hart was accused of causing scrap production, despite not having signed off on the production of these materials, leaving no clear record of his involvement. Hart was required to check every fifth part to ensure the parts were accurate. Deere held a DAH related to this accusation on February 12, 2021. At the hearing, the union representative pointed out the lack of evidence against Hart and suggested that Nieman or another closely-working employee could be responsible for the scrap. The representative also stated he was not aware of any case in which an unsigned-off product resulted in employee discipline.

Nieman reported at the DAH that Hart "said he thought he knew what he did, something to that effect" and felt that Hart "made the choice not to do the check . . . ." Doc. 23-1 at 33. The parties dispute whether this hearing resulted in any discipline. According to Hart, Deere issued a two-week paper-only suspension, which was later withdrawn on March 30, 2021. Deere maintains that no discipline was issued for this matter and that Hart testified as such during his deposition. Deere also cites the hearing

minutes, which include a statement that "[n]o discipline was issued for this matter." Doc. 23-1 at 35. However, that statement is dated "30MAR21." *Id*.

On March 25, 2021, Nieman found Hart at his work station an hour after Hart's shift had begun, "just sitting there." Nieman asked Hart about cleaning another employee's work cell and Hart "asked [Nieman] why didn't he have [Hart's co-worker] clean it at the time [Hart's co-worker] was down in his cell." Doc. 18-1 at 20. Nieman called Hart and Hart's union steward, Pat Weber, to his office. Hart claims Nieman was yelling at Hart and pointing his finger at him. Hart called Nieman "a racist mother fucker" and walked out of Nieman's office. The next day, Hart called the Deere Compliance Hotline to complain about Nieman.

On March 30, 2021, Deere held a DAH for Hart for "calling a member of management a 'racist mother fucker.'" The parties dispute the repercussions from this hearing. They agree that Deere decided not to discipline Hart and continued investigating his claims of discrimination until April 26, 2021. Jenny Wilcox, HR Compliance Investigator, interviewed several individuals as part of her investigation, but not any witnesses identified by Hart. Wilcox's investigation also involved reviewing additional complaints of discrimination made by other Black employees against Nieman. Wilcox did not interview these employees in relation to Hart's complaint but did interview a white employee who expressed his belief that Nieman did not discriminate against employees based on their race. Wilcox ultimately determined that Hart's complaints were unfounded.

Nieman was subsequently transferred to a new department and no longer supervised Hart. Hart experienced no further issues with Deere and Nieman. In April 2021, Deere dissolved Department 510, causing Hart and his co-workers to be transferred to other departments. Hart had learned of the dissolution of Department 510 on October 12, 2020, when Nieman told him about the dissolution and eventual transfer. Hart did not experience any change in pay, benefits, or shift change as a result of the transfer. Deere transferred Hart to Department 421 on April 26, 2021.

6

Hart admits that Nieman did not use racially pejorative terms with Hart and that he never heard Nieman refer to Hart's skin color or race, or make racist jokes or racially pejorative comments about anyone. Hart filed his claim of race discrimination with the Iowa Civil Rights Commission on August 12, 2021.

## V.  ANALYSIS

Deere argues it is entitled to summary judgment on all of Hart's claims. With regard to his disparate treatment claims, Deere argues Hart has not established that he experienced an adverse employment action or that his race or color motivated Deere's actions. With regard to Hart's retaliation claim, Deere argues that Hart cannot demonstrate materially adverse actions, a causal connection between protected activity and discipline or transfer and has no evidence of retaliatory pretext. Finally, it argues his harassment claim fails because the undisputed facts show there was no severe or pervasive conduct related to his race or color.[2] I will discuss the disparate treatment claims and retaliation claim in turn.

### A.  *Disparate Treatment Claims*

Deere notes that Hart alleges four separate disparate treatment claims, with three arising out of Deere's handling of disciplinary matters and the fourth out of his transfer to another department. The three disciplinary matters include: (1) Deere's issuance of written discipline in November 2020; (2) Deere convening a DAH in February 2021 to consider whether to issue discipline; and (3) Deere convening a DAH in March 2021 to consider whether to issue discipline. Deere contends Hart received no discipline with respect to the last two DAHs. Hart was transferred to a new department in spring 2021.

---

[2] Hart does not resist summary judgment on his claim for hostile work environment/harassment. *See* Doc. 23 at 17.

7

Deere contends that because there is no direct evidence of discrimination, Hart's claims must be evaluated under a "modified *McDonnell Douglas* test." *See Feeback v. Swift Pork Co.*, 988 N.W.2d 340 (Iowa 2023).[3] Deere argues that all of Hart's disparate treatment claims fail because none of them involved an adverse action and there is no evidence that Deere's decisions were pretext for race discrimination.

Hart relies on *Banks v. John Deere & Co.*, No. C13-2088, 2015 WL 13358239 (N.D. Iowa Apr. 13, 2015) to argue that DAH discipline constitutes an adverse employment action. With regard to pretext, Hart relies on five factors: (1) the proximity in time between his October 20, 2020 complaint and the November 10, 2020, DAH, (2) inconsistencies between discipline given to white employees for the same conduct, (3) evidence that Deere received reports of racial bias and discrimination by Nieman from other employees, (4) the lack of evidence to support Hart's discipline following the February 12, 2021 DAH and (5) the factual similarity with *Banks*. Hart challenges Deere's actions only as to the November 20, 2020, and February 12, 2021, DAH. Therefore, I will limit my consideration of his disparate treatment claims to those events.

*Banks* involved claims of race discrimination and harassment at the same Deere facility and discipline for the same complaint of failing to follow instructions resulting in scrap. *Banks*, 2015 WL 13358239, at *2. This resulted in a DAH and a 30-day unpaid suspension based, in part, on Banks' disciplinary record, as he had previously received a three-day suspension and a two-week suspension, making a 30-day unpaid suspension

---

[3] The Iowa Supreme Court modified the *McDonnell Douglas* framework for summary judgment on ICRA discrimination claims that rest on indirect evidence to align the summary judgment test with the mixed-motive causation standard and the same-decision defense that may be used at trial. *Feeback*, 988 N.W.2d at 347. It had previously abandoned the *McDonnell Douglas* framework at trial and used the motivating factor causation test from *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989), but had not decided whether to abandon the *McDonnell Douglas* framework on summary judgment. In *Feeback*, the Court clarified that it would use the *McDonnell Douglas* framework to evaluate ICRA discrimination claims on summary judgment but would still recognize the mixed-motive causation standard and same-decision defense.

the next step.  *Id.* at *3.  Later, Deere discovered a "bookkeeping error" in Banks' disciplinary record, in which his first disciplinary action should have been recorded as a PAFS, making his second disciplinary action a 3-day suspension and the most immediate disciplinary action a 2-week suspension instead of the 30-day unpaid suspension under Deere's progressive disciplinary action process.  *Id.* at *3-4.  As such, Deere reduced the 30-day suspension to a 2-week paper-only suspension and Banks was paid the wages he would have earned at the rate and hours applicable during his suspension including overtime and holiday pay that Banks had missed during his suspension.  *Id.* at *4.

One of Banks' race discrimination claims was based on this disciplinary action. The court concluded that even though Deere had modified the sanction, the finding that he failed to follow instructions resulting in running scrap impacted his status for any future violations, and thus constituted an adverse employment action.  *Id.* at *7. Specifically, the court noted it constituted "other employment-related harm" because it "moved him up one step on the disciplinary ladder."  *Id.*  Ultimately, Banks' claim failed, however, because he failed to produce any evidence that the decision and the resulting discipline were race-based.  *Id.* at *8.  The Eighth Circuit affirmed.  *See Banks v. Deere*, 829 F.3d 661 (8th Cir. 2016).

The ICRA protects individuals from discrimination in employment on the basis of race.  Iowa Code § 216.6.  Generally, Iowa courts apply the same framework to analyze claims brought under the ICRA that federal courts apply to claims brought under Title VII of the Civil Rights Act of 1964.  *See Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003) ("Because the ICRA is modeled after the federal legislation, Iowa courts have traditionally looked to federal law for guidance in interpreting it.").  When a plaintiff presents indirect evidence of race discrimination, as is the case here, the claim is analyzed under the *McDonnell Douglas* burden-shifting framework.  *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014).

Under that framework, a plaintiff must first show a prima facie case of discrimination.  *Id.* at 577–78; *see also Hawkins v. Grinnell Reg'l Med. Ctr.*, 929

9

N.W.2d 261, 268 (Iowa 2019). To establish a prima facie case of discrimination, a plaintiff must make a minimal evidentiary showing that he or she (1) is a member of a protected class, (2) was qualified for the position or met his or her employer's legitimate expectations, (3) suffered an adverse employment action and (4) that the circumstances of his or her employment, or adverse employment action, give rise to an inference of discrimination. *Banks*, 829 F.3d at 666; *Young*, 754 F.3d at 577; *see also Mahn v. Jefferson Cty., Mo.*, 891 F.3d 1093, 1096 (8th Cir. 2018) (establishing a prima facie case requires a minimal evidentiary showing). Establishing a prima facie case creates a presumption that the employer discriminated against the plaintiff. *Banks*, 829 F.3d at 666.

If a plaintiff establishes a prima facie case, the burden then shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for its action. *Young*, 754 F.3d at 577–78. If the defendant does so, the burden shifts back to the plaintiff to show that the reason for the defendant's actions is a pretext for unlawful discrimination. *Id.*; *see also McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009). Under Iowa's the mixed-motive causation standard, a plaintiff could demonstrate that while the employer's proffered reason was true, it "was not the only reason for [the adverse action] and that his [membership in a protected class] was another motivating factor." *Feeback*, 988 N.W.2d at 348.

### 1.    *Adverse Employment Action*

As noted above, Hart's disparate treatment claims are based on Deere's issuance of written discipline following a DAH in November 2020 and Deere convening a DAH in February 2021 to consider whether to issue discipline. With regard to the February 2021 DAH, Deere argues that Hart cannot demonstrate a genuine issue of material fact by taking an inconsistent position with his deposition testimony. Deere states that it "decided against issuing discipline related to the February 12, 2021 hearing, and Hart's pay and position did not change following the February 12, 2021 disciplinary action

10

hearing." Doc. 18-2 at 4. Hart disputes this statement of fact, stating that after the February 12, 2021, DAH, Deere "issued a 2-week, paper-only suspension for Plaintiff, decided by Ms. Harn to stay on his record for three years, which was later withdrawn on March 30, 2021, without providing any rationale." Doc. 23-2 at 6. In support, he cites documentation from the February 12 DAH, in which the disposition states:

> It was the decision of Management Mr. Hart [sic] record reflects a (2) week suspension. Mr. Hart was notified the discipline would remain on his record for (3) years, and if it becomes necessary to discipline in the future, the discipline would be more severe up to and including discharge.

Doc. 23-1 at 35. After that, there is a note in red stating, "It was decided to not reconvene this hearing, and this will remain as documentation only. No discipline was issued for this matter (DH on 30MAR21)." *Id*. This is not inconsistent with Hart's deposition testimony, which was:

> Q: So had this ever issued to you, the discipline or was it just sort of like undetermined and then ultimately thrown out?
>
> A: It was brought up to me. We had a hearing (indicating) on that date. A later date they threw it out.
>
> Q: Okay, so you were – you were never given a two-week suspension?
>
> A: No.

Doc. 18-1 at 16. The parties agree that no discipline was ultimately issued. The record supports Hart's argument that this was not Deere's initial position.

With regard to whether the February or March 2021 DAHs are "adverse actions," Deere argues that Hart misconstrues *Banks*. First, Deere notes that following the DAH in *Banks*, the plaintiff received a two-week paper suspension. Thus, the hearing itself was not an adverse action as it was convened merely to consider whether to impose discipline. Rather, the subsequent two-week paper suspension in *Banks* was considered the adverse action. Deere argues there is no authority to support that mere consideration of discipline via a DAH is sufficient to constitute adverse action. However, Hart does

11

not argue that the hearings themselves were the adverse actions. Rather, he argues that discipline following the November 10, 2020, and February 12, 2021, DAHs constituted adverse employment actions. *See* Doc. 23 at 12. He was given a three-day suspension on paper after the November 10 DAH and there is a disputed fact as to whether Deere imposed a two-week suspension after the February 12 DAH that was later withdrawn in March 2021.

In the broadest sense, "[a]n adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1107 (8th Cir. 2016) (quoting *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005)). It includes, but is not limited to, "termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman v. Fifth Judicial Dist. Dept. of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013); *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 742 (Iowa 2003) ("Conduct constituting a materially adverse employment action . . . . includes subtle conduct such as depriving an employee of the opportunity to advance, as well as more obvious actions such as 'disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period.'" (quoting *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 862–63 (Iowa 2001))). "However, minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Jackman*, 728 F.3d at 804; *Farmland Foods, Inc.*, 672 N.W.2d at 742.

With regard to the three-day paper-only suspension following the November 10 DAH, the district court in *Banks* concluded that a paper-only suspension constituted "other employment-related harm" because "it moved him up one step on the disciplinary

12

ladder."[4] *Banks*, No. C13-2088, 2015 WL 13358239, at *7 (N.D. Iowa Apr. 13, 2015).[5] Other courts have also found that a suspension on paper constitutes an adverse employment action. *See Abraham v. Potter*, 494 F. Supp. 2d 141, 148 (D. Conn. 2007) (concluding a seven-day paper suspension qualified as an adverse employment action because it meant plaintiff was subject to a reprimand and there were "other negative results"); *Borneman v. Principal Life Ins. Co.*, 291 F. Supp. 2d 935, 961 (S.D. Iowa 2003) (formal written warnings constituted adverse employment action when they "were a direct cause of [plaintiff] being chosen as the person to be downsized from his department.").

I agree that the three-day paper suspension constituted an adverse action because it moved Hart one step up on the disciplinary ladder, subjecting him to more severe discipline in the future. For purposes of Deere's motion, I will also assume that the two-week suspension following the February 12 DAH, that was later rescinded, could also constitute an adverse employment action. *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71-72 (2006) (reasoning that even a reinstatement of employee with backpay following an unpaid suspension constitutes an adverse action based on the effects during the suspension). While Hart's suspension was for two weeks and paper-only, courts have recognized that employers who impose adverse employment actions with discriminatory intent should not be able to avoid sanctions simply by rescinding the adverse action at a later date. *See Abraham*, 494 F. Supp. 2d at 149 (applying *Burlington Northern and Santa Fe Ry. Co.*'s reasoning to a seven-day paper suspension that was

---

[4] Deere argues that Banks was subject to a different labor agreement and that Hart's labor agreement does not limit any employee who receives discipline from any employment activity. However, Deere does not dispute that a paper-only suspension moves Hart up one step on the disciplinary ladder under his labor agreement.

[5] The Eighth Circuit did not consider this issue on appeal because it found Banks had failed to adduce evidence that race "was a motivating factor" in Deere's decision to discipline him. *Banks*, 829 F.3d at 666.

13

reduced to a formal Letter of Warning a month later and then reduced to an "official discussion" five months after that based on plaintiff's good behavior).

Viewing the facts in the light most favorable to Hart, he has demonstrated that discipline imposed after the November 10, 2020, and February 12, 2021, DAHs could be considered adverse employment actions. Therefore, I will proceed with the *McDonnell Douglas* analysis as to those two actions.

### 2. Pretext

Even if Hart can establish adverse employment actions, Deere argues that his disparate treatment claims fail because he cannot demonstrate that Deere's legitimate, non-discriminatory reasons for the alleged adverse actions are a pretext for race discrimination. Deere notes that Hart admits he engaged in the conduct that led to his November 2020 discipline and argues he has no other evidence of discriminatory pretext. It also argues he has not adduced any evidence to show that discriminatory pretext motivated the February 2021 DAH.

Hart cites five bases for pretext in his resistance. With regard to the November 10, 2020, DAH, Hart relies on the proximity in time following his October 20, 2020, complaint against Nieman, inconsistencies with discipline given to white employees for the same conduct and other reports of racial bias and discrimination by Nieman from other employees. With regard to the February 12, 2021, DAH, he relies on the lack of evidence that Hart had performed the work that led to scrap and the fact that the *Banks* case involved similar issues at the same facility.

"[T]here are multiple ways 'a plaintiff can establish an inference of discrimination.'" *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 937 (8th Cir. 2019) (quoting *Grant v. City of Blytheville*, 841 F.3d 767, 774 (8th Cir. 2016)). There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext: (1) showing that the employer's explanation is "unworthy of credence . . . because it has no basis in fact" or (2) "by persuading the court that a [prohibited] reason more likely

14

motivated the employer." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011), *quoted approvingly by Wyngarden v. Iowa Judicial Branch*, 856 N.W.2d 2, *12-13 (Iowa Ct. App. 2014). "[A] common approach to show pretext is to introduce evidence that the employer treated similarly-situated employees in a disparate manner." *Feeback*, 988 N.W.2d at 350. Whatever evidence a plaintiff presents, however, must be "sufficiently related to the adverse employment action in question to support such an inference." *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426–28 (8th Cir. 1999) (stray remarks regarding employee's status as a father were not sufficiently related to company's decision to fire employee as part of larger downsizing to justify inference of age discrimination).

Beginning with the November 10, 2020, DAH, Hart relies on proximity in time to his October 20 complaint, inconsistencies with discipline given to white employees for the same conduct and reports of racial bias and discrimination by Nieman from other employees. With regard to proximity in time, Deere is correct that the case Hart relies on, *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 875 (8th Cir. 2008), relates to a claim of retaliation rather than disparate treatment. Here, the temporal proximity would need to support an inference of discrimination rather than retaliation. Hart cites no case holding that temporal proximity may be used to infer discrimination rather than retaliation. Unlike retaliation, a disparate impact claim does not require proof that the plaintiff engaged in protected activity. Hart's argument does not suggest that he was treated differently based on his race, but that he was retaliated against for filing a complaint. The temporal proximity does not create an inference of discrimination for purposes of Hart's disparate treatment claim.

Unlike temporal proximity, "a common approach to show pretext is to introduce evidence that the employer treated similarly-situated employees in a disparate manner." *Feeback*, 988 N.W.2d at 350 (quoting *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019)). With this type of evidence, "a plaintiff must show that [he or] she and the more leniently treated employees were 'similarly situated in all relevant

15

respects.'" *Gibson v. Concrete Equipment Co., Inc.*, 960 F.3d 1057, 1063 (8th Cir. 2020) (quoting *Jones v. Frank*, 973 F.2d 673, 676 (8th Cir. 1992)). "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Feeback*, 988 N.W.2d at 350 (quoting *Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 750 (8th Cir. 2021)). "The test to determine whether employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003) (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)).

Hart has identified one comparator – the only other employee who was disciplined for producing scrap in Departments 509 and 510 from 2017 through 2021. This employee is white. He produced $30,000 worth of scrap on January 28, 2020. Doc. 23-1 at 47. At his DAH on February 20, 2020, Deere disciplined this employee with a three-day suspension on paper that would remain on the employee's work record for one year. *Id.* at 48. The employee had no PAFS or other discipline in his work record at the time. Hart also received a three-day paper suspension following the November 10 DAH, but his would remain on his work record for three years.

Deere argues that Hart's violation was substantially more serious because it was a continuing failure to perform required checks over a 21-day work period. *Id.* at 29. The other employee's violation was for a single instance in which he failed to enter an offset for a tool change on a single day. *Id.* at 47. Deere also argues that Hart and the white employee were disciplined for different conduct. Hart was disciplined for "[f]ailure to follow NDS" while the white employee was disciplined for "[f]ailure to enter new offset when changing tool." *Id.* at 36. Finally, the white employee indicated that he may have had a trainee with him at the time of his violation, while Hart did not offer any type of mitigating evidence at his DAH. *Id.* at 29, 47.

I agree with Deere that due to these differences, Hart has failed to meet the "rigorous" standard of showing the employees were "similarly situated." *See Feeback*,

16

988 N.W.2d at 350 ("the test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous"); *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003) ("Three other individuals are not similarly situated because [the plaintiff] did not establish that the circumstances of their misconduct were comparable in severity or frequency to [her] infractions."). Hart's comparator evidence fails to create an inference of discrimination.

Hart also relies on evidence that Deere had received reports of racial bias and discrimination by Nieman from other employees. Hart cites Wilcox's report in April 2021. Doc. 23-1 at 20. The report states that both Hart and Patrick Weber, a Machining Set-Up and Union Steward, spoke about two Black employees claiming they were treated differently based on their race. *Id.* The only specific example they gave was that one employee was disqualified by Nieman for the machining set-up position. *Id.* Wilcox noted this was grieved and submitted to compliance in January 2021. Nieman provided extensive documentation of this employee's performance over the course of a month to justify why the employee was disqualified from the job. The documentation showed this employee lacked the technical skills and abilities required to perform the job adequately, even after several weeks of training, and Labor Relations agreed. *Id.* Deere argues this evidence is immaterial because it bears no relationship to Hart or the alleged adverse actions and Hart does not contend that he personally witnessed or experienced what was allegedly reported. Deere contends that the evidence Hart relies on does not show that any employee's treatment was motivated by race.

While a plaintiff may use other discriminatory practices as circumstantial evidence of pretext, "[t]he evidence, however, must assist in the development of a reasonable inference of discrimination within the context of each case's respective facts." *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1419 (8th Cir. 1995). Evidence of multiple employees complaining about discrimination at a single workplace is often referred to as "me too" evidence. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286–87 (8th Cir. 2008); *Buckley v. Mukasey*, 538 F.3d 306, 309 (4th Cir. 2008). Its relevance "depends

17

on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Generally, factors to consider include "(1) whether past discriminatory or retaliatory behavior is close in time to the events at issue in the case, (2) whether the same decisionmaker was involved, (3) whether the witness and plaintiff were treated in the same manner, and (4) whether the witness and plaintiff were otherwise similarly situated." *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144–45 (D.D.C. 2011) (citing *Nuskey v. Hochberg*, 723 F.Supp.2d 229, 233 (D.D.C. 2010)). "[T]he test for whether employees are similarly situated is strict; the employees must be 'similarly situated in all material respects.'" *Smith v. URS Corp.*, 803 F.3d 964, 970 (8th Cir. 2015).

Hart has failed to show that his "me too" evidence is persuasive. The evidence does not show that the other two employees who made complaints against Nieman were similarly situated in the alleged actions taken by Nieman. Indeed, while Hart referenced other Black employees' complaints against Nieman, he was only able to provide one example, which involved that employee's disqualification for a particular position. The other employee had been written up for absenteeism. Doc. 23-1 at 36. Hart complains that neither of these employees were interviewed with regard to Hart's complaint while Deere did interview a white employee, who stated he did not believe Nieman treated employees differently based on their race. This evidence is too speculative to support an inference of discrimination as to Hart's case. The discipline for absenteeism occurred in 2018. *Id.* While the disqualification of the other employee occurred closer in time to Hart's complaint, nothing suggests that that employee and Hart were treated in the same manner by Nieman or that they were otherwise similarly situated. Indeed, the circumstances were very different, involving qualification for a particular position versus Nieman giving work instructions to a subordinate. This evidence fails to generate an inference of discrimination.

With regard to his February DAH, Hart relies on the lack of evidence that he was responsible for the scrap and not some other employee. The documentation Hart provides for the February 12, 2021, DAH (which does not appear to be the entire record) states that Scot Slickers, the committeeman present for the union, stated he had never seen discipline issued for scrap when the employee had not "personally signed off on their sheet to be authorized as an operator by themselves." Doc. 23-1 at 14. While there is a disputed fact as to whether discipline was initially imposed, the parties agree that Hart ultimately did not receive any discipline for this action.

In any event, the outcome of this DAH is immaterial, as Hart suggests that the fact the DAH was even convened under these circumstances creates an inference of discrimination. Deere argues the fact that it convened a hearing to investigate and consider whether to issue discipline is not sufficient to establish an inference of discrimination. I agree. "The appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 795 (8th Cir. 2011) (quoting *McCullough v. Univ. of Ark. For Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009)). *See also Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1127 (8th Cir. 2017) ("Even if the investigation were somehow flawed, a shortcoming in an internal investigation alone, without additional evidence of pretext, would not suffice to support an inference of discrimination on the part of the employer."). The point of the DAH is to determine what happened and consider whether discipline is warranted. There is no suggestion that Deere knew about the signoff issue prior to the hearing or that it convened the DAH for an improper purpose reflecting a discriminatory intent. This evidence fails to establish an inference of discrimination.

Finally, Hart relies on the circumstances in *Banks*, which took place at the same Deere facility, but did not involve the same supervisor and took place approximately seven years earlier than Hart's 2020 DAH. This "me too" evidence is irrelevant to

Deere's actions involving Hart and is insufficient to demonstrate an inference of discrimination.

Hart has failed to demonstrate that the circumstances surrounding either the November 10, 2020, DAH or the February 12, 2021, DAH – or any subsequent discipline – support an inference of discrimination. Even if Hart is able to establish a prima facie case of discrimination, he is unable to show that the reasons stated by Deere for its actions were pretext. As such, Deere is entitled to summary judgment on Hart's claims of disparate treatment based on race discrimination.

## B.    *Retaliation Claim*

Deere relies on many of the same arguments in challenging Hart's retaliation claim. With respect to the DAHs,[6] Deere argues Hart fails to establish that these hearings are materially adverse actions. It also argues that Hart's October 2020 report was not "protected activity" and that there is no causal link between that report and the DAHs. Finally, Deere argues Hart has failed to generate a disputed issue of fact on retaliatory pretext because he has not provided evidence that his proffered comparator engaged in protected activity. Rather, he relies on their racial differences.

The ICRA makes it an unfair discriminatory practice for "[a]ny person to . . . retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter." Iowa Code § 216.11(2). Where, as here, a plaintiff presents no direct evidence of retaliation, the claim is analyzed under *McDonnell Douglas*. Under this framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation. *Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir. 2006). The defendant then must offer a

---

[6] In responding to Deere's motion, Hart again focuses only on the November 10, 2020, and February 21, 2021, DAHs. Doc. 23 at 16-17. As such, my analysis of retaliation will focus on those actions only.

legitimate, non-discriminatory reason for the employment action. *Id.* The burden of production then returns to the plaintiff to show that this reason was a pretext for retaliation. *Id.*

To establish a prima facie case of retaliation, the plaintiff must present evidence that (1) he engaged in a protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the two. *Barker v. Missouri Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008); *Thompson v. Bi–State Dev. Agency*, 463 F.3d 821, 826 (8th Cir. 2006). To engage in protected activity, an employee "must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Godfrey v. State*, 962 N.W2d 84, 107 (Iowa 2021) (quoting *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (per curiam)).

To prove causation under the ICRA, the plaintiff must show that the protected conduct was a "motivating factor" in the employer's adverse employment decision. *See Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 32 (Iowa 2021). An unsupported, self-serving allegation that an employer's decision was based on retaliation cannot establish a genuine issue of material fact. *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1088 (8th Cir. 2011). "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Rumsey*, 962 N.W.2d at 32 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). Evidence of causation may include "evidence of discriminatory or retaliatory comments" or evidence of "a pattern of adverse action or escalating adverse actions after the protected activity." *Orluske v. Mercy Med. Ctr.-N. Iowa*, 455 F. Supp. 2d 900, 922 (N.D. Iowa 2006). A causal link may be broken if the decisionmaker for the adverse action was unaware of the protected activity. *Id.*

Here, Deere challenges Hart's retaliation claim on the prima facie elements as well as his ability to demonstrate pretext. With regard to the prima facie elements, Deere first argues that Hart has failed to generate a disputed issue of fact on whether there were

adverse actions. For the reasons described above, I find there is a genuine issue of material fact as to whether any discipline imposed after the November 10, 2020, and February 20, 2021, DAHs constituted adverse action.

Deere's second argument is that the October 2020 complaint was not "protected activity" and therefore cannot establish the requisite causal link between that complaint and any adverse action. Hart contends that a causal connection exists between his race and the adverse actions. As Deere points out, this is the wrong inquiry for a retaliation claim. The appropriate inquiry is whether there is a causal connection between the protected activity and the adverse action. As to any protected activity, Hart relies on his October 20, 2020, complaint and argues that the proximity in time to the discipline he received from the November 10, 2020, and February 21, 2021, DAHs support a causal relationship, as does the inconsistent application of discipline between himself and a white employee. Doc. 23 at 16.

With regard to whether the October 2020 complaint can constitute protected activity, Deere notes that it contains no indication that Hart felt he was being treated differently because of his race or skin color, that he was experiencing discrimination, harassment, or retaliation or that he was otherwise opposing a discriminatory practice. The only information Hart has provided about this complaint comes from Wilcox's notes related to Hart's March 2021 complaint about Nieman to Deere's Compliance Hotline. Wilcox wrote:

> When Dennis submitted this report, he made reference to a complaint that he made in October 2020 alleging that Rodney's "inappropriate behavior" persists. That complaint reference [sic] behavior that Rodney watches Dennis, but as Dennis's supervisor, Rodney has the responsibility of overseeing his work group and the work they are responsible for completing, which includes making sure employees are at their assigned work stations completing tasks. Attached is the complaint that Dennis sent to Labor Relations at that time.

Doc. 23-1 at 22. Hart's October 2020, complaint is not in the record. In any event, Deere argues a generalized complaint about being watched is not protected activity under the ICRA. *See* Iowa Code § 216.11(2).

I agree. Hart's evidence does not establish that he was complaining about unlawful discrimination when he made his October 20, 2020, complaint regarding Nieman. While perhaps there was more to his complaint, Hart has not come forward with any evidence from which a reasonable jury could draw that conclusion. *See Hunt v. Nebraska Public Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) (plaintiff did not engage in a protected activity when she raised complaint that she was entitled to higher pay and different job title but failed to attribute employer's actions to sex discrimination). Without evidence that Hart engaged in protected activity prior to any adverse action, Hart's retaliation claim necessarily fails at the prima facie stage. As such, Deere is entitled to summary judgment on Hart's claim of retaliation.[7]

## VI. CONCLUSION

For the reasons stated herein:

1. Deere's motion (Doc. 18) for summary judgment is **granted** as to all claims.

2. This action is hereby **dismissed** and judgment **shall enter** in favor of Deere and against Hart.

3. The trial of this case, currently scheduled to begin December 11, 2023, is hereby **canceled**.

4. The Clerk of Court shall **close this case**.

---

[7] I further find that even if Hart engaged in protected activity, he has failed to show a genuine issue of material fact as to causation (i.e., whether that activity was a motivating factor with regard to Deere's disciplinary decisions).

23

**IT IS SO ORDERED.**

**DATED** this 11th day of October, 2023.

_____
Leonard T. Strand, Chief Judge